UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lennie Herman Perry, | |
| Plaintiff, | Case No. 18 C 2447 |
| v. | |
| Randy Pfister, Wexford Health Sources, Inc., and Walter Nicholson, | Judge John Robert Blakey |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lennie Herman Perry, a former inmate at multiple Illinois Department of Corrections (IDOC) facilities, sues under 42 U.S.C. § 1983 alleging that: (1) Defendants Randy Pfister, Wexford Health Sources, Inc., and Walter Nicholson violated his Eighth Amendment rights by denying him adequate medical care (Count I); and (2) Defendant Pfister violated his Eighth Amendment rights by subjecting him to inhumane confinement conditions (Count II). *See* [185]. Defendants Wexford and Pfister and Nicholson separately move to dismiss [187], [188]. For the reasons explained below, this Court denies Wexford's motion [187] and grants in part and denies in part Pfister and Nicholson's motion [188].

**I. Background[1]**

From December 28, 2017 through November 7, 2018, Plaintiff was incarcerated at multiple IDOC facilities, including the Northern Reception and Classification

---

[1] The facts come from Plaintiff's Second Amended Complaint, [185], and are assumed to be true for present purposes.

1

Center (NRCC).[2] [185] at ¶ 7. Defendant Wexford is a foreign corporation licensed to do business in Illinois that provides various medical and health services to those incarcerated within the IDOC system. *Id.* at ¶ 9. Defendant Pfister served as the Assistant Warden of Programs at Stateville Correctional Center. *Id.* at ¶ 8. Defendant Nicholson served as Stateville's warden. *Id.* at ¶ 10.

Upon Plaintiff's intake at the NRCC, IDOC placed Plaintiff in a cell that was drafty and poorly insulated. *Id.* ¶ 59. The temperature within Plaintiff's cell was approximately the same as the outside temperature. *Id.* Plaintiff remained in this cell from about December 28, 2017 to January 22, 2018. *Id.* During this time, the temperatures outside were regularly below freezing and occasionally below zero. *Id.* Plaintiff complained to correctional officers about the cold, but they did nothing to alleviate his discomfort; they did not provide extra clothing or blankets and did not move him to a warmer cell; rather, during this time, Plaintiff had just a bedsheet, which was too small for his bed and appeared to be stained with blood, and minimal clothing, which was multiple sizes too small for him. *Id.* at ¶ 60.

Around January 18, 2018, Plaintiff filed a grievance about the freezing temperatures. *Id.* Defendant Pfister received the grievance and downgraded it to nonemergency status. *Id.* The grievance was later denied as moot after IDOC transferred Plaintiff to Pinckneyville. *Id.*

---

[2] Plaintiff alleges that he is presently being held as a pre-trial detainee at the Metropolitan Correctional Center. *See* [185] at ¶ 7. But his allegations stem, not from his time as a pretrial detainee, but from his post-conviction incarceration in IDOC facilities.

In April 2018, after IDOC transferred Plaintiff back to the NRCC, IDOC placed Plaintiff in a cell infested with rodents. *Id.* at ¶ 61. During this time, Plaintiff saw mice in his food. *Id.* Plaintiff filed a grievance around April 15, 2018. *Id.* An unnamed official downgraded the grievance to nonemergency status. *Id.* Plaintiff's later transfer to Pinckneyville around April 25, 2018 mooted the grievance. *Id.*

Prior to Plaintiff's incarceration, doctors diagnosed him with several medical conditions, including sleep apnea, continuing care following gastrectomy surgery, hypertension, arthritic pain, and lumbar issues. *Id.* at ¶ 15. When IDOC took Plaintiff into its custody, his treatment for these conditions remained ongoing. *Id.* at ¶ 16. Plaintiff's treatments included dietary restrictions and increased eating time following his gastrectomy surgery; medication, crutches, and activity restrictions for his arthritis; medication for high blood pressure; medication for chronic acid reflux; and a CPAP machine for his sleep apnea. *Id.* at ¶¶ 18–19, 23, 27. Prescribing doctors generally required Plaintiff to take his many medications daily and consistently. *Id.* at ¶ 24. Plaintiff alleges that the Defendants deprived him of some or all of these treatments throughout his time in IDOC custody, which put his health in jeopardy. *Id.* at ¶ 16.

During the course of his eleven months in IDOC custody, Plaintiff spent time inside the NRCC and at "other IDOC facilities." *Id.* at ¶ 23. All told, IDOC transferred Plaintiff seven times between these various facilities. *Id.* After each transfer, IDOC informed Plaintiff that his various medications did not transfer with him to his new facility. *Id.* Plaintiff alleges that, on numerous occasions after a

3

transfer, he filed a grievance, usually an emergency grievance, complaining that IDOC did not transfer his medication with him. *Id.* at ¶ 25. The individuals who received Plaintiff's grievances downgraded them to nonemergency status and then either denied them or referred them to the medical unit. *Id.* This meant that, to receive his medication after a transfer, Plaintiff needed to file a grievance, wait for the medical unit to resolve it, and live without medication in the meantime, generally for a week or more. *Id.* Plaintiff alleges that Defendant Nicholson received two of these medication- and treatment-related grievances. *Id.* at ¶¶ 45, 52. He alleges that Defendant Pfister received one. *Id.* at ¶ 29.

In addition to medication, Plaintiff also required a CPAP machine to manage his sleep apnea. *Id.* at ¶ 27. When the healthcare unit staff evaluated Plaintiff at the NRCC around December 28, 2017, he told the staff about his sleep apnea and his need for a CPAP machine. *Id.* at ¶ 28. The staff recorded this information in Plaintiff's file. *Id.* When he did not receive a CPAP machine, Plaintiff filed an emergency grievance. *Id.* at ¶ 29. Defendant Pfister received the grievance and downgraded it to nonemergency status. *Id.* at ¶ 30. Plaintiff filed at least two other grievances about his lack of access to a CPAP machine while at the NRCC. *Id.* at ¶ 31. IDOC then transferred Plaintiff multiple times, primarily between the NRCC and Pinckneyville. *Id.* at ¶ 34. During this time, Plaintiff submitted more grievances about his lack of a CPAP machine, all of which IDOC denied. *Id.* at ¶ 35. On July 2, 2018, IDOC finally allowed Plaintiff's family to bring in the CPAP machine Plaintiff used before he was incarcerated. *Id.* at ¶ 37. IDOC did not, however, provide Plaintiff

4

with the parts and supplies necessary for the proper function of the machine (water, filters, hoses, masks) at any point before IDOC discharged Plaintiff from its custody around November 7, 2018. *Id.*

Throughout his time in IDOC custody, Plaintiff filed grievances related to other medical issues. Plaintiff's gastrectomy surgery required him to maintain a special diet and caused him to suffer from a Vitamin D deficiency and chronic acid reflux. *Id.* at ¶¶ 38–40. Upon arrival at the NRCC, medical staff wrote Plaintiff a prescription for acid reflux medication and a Vitamin D supplement, but Plaintiff did not receive either for about a week. *Id.* at ¶ 41. During this time, Plaintiff also did not receive his prescribed special diet, an issue Plaintiff raised in several grievances and which IDOC either denied or deemed moot after IDOC transferred Plaintiff to Pinckneyville. *Id.* at ¶ 42. After the transfer to Pinckneyville, Plaintiff lived without his acid reflux medication for more than three weeks because the medical staff needed to refill the prescription after the transfer. *Id.* at ¶¶ 43–44. When IDOC transferred Plaintiff back to the NRCC around February 21, 2018, IDOC did not transfer Plaintiff's medications with him. *Id.* at ¶ 45. Plaintiff filed grievances about the lack of medication on February 22 and 23, 2018. *Id.* He received his medication again around February 24, 2018. *Id.* at ¶ 46.

Similarly, Plaintiff required medication to manage hypertension. *Id.* at ¶ 48. Upon intake at the NRCC, medical staff provided Plaintiff with a three-day supply that ran out on December 31, 2017. *Id.* at ¶ 50. The staff refilled the prescription January 3, 2018. *Id.* The medication did not transfer with Plaintiff when IDOC sent

5

him to Pinckneyville, and he filed two grievances in response. *Id.* at ¶ 51. Plaintiff filed two more grievances about his hypertension medication on February 22 and 23, 2018. *Id.* at ¶ 52. Defendant Nicholson downgraded the February 23 grievance to nonemergency and referred it to the medical unit. *Id.*

Plaintiff's primary physician also prescribed him pain medication for arthritis and back pain. *Id.* at ¶ 53. Like his hypertension medication, medical staff at the NRCC prescribed Plaintiff with a three-day supply of pain medication, which ran out on December 31, 2017, and which the medical staff refilled on January 3, 2018. *Id.* at ¶ 57. This new supply lasted about one month, and Plaintiff never again received pain medication while in IDOC custody. *Id.* This medication also did not transfer with Plaintiff when IDOC transferred him to Pinckneyville. *Id.* Plaintiff filed further grievances about his lack of pain medication. *Id.* at ¶ 58. IDOC granted none. *Id.*

Plaintiff initiated this lawsuit *pro se* on April 5, 2018. [1]. This Court dismissed part of Plaintiff's original complaint without prejudice, [36], admonishing Plaintiff "that he cannot bring unrelated claims (in a legal sense) against unrelated defendants in the same lawsuit. Any medical care (or lack thereof) that Plaintiff may have received at Pinckneyville would have been provided by different Defendants in a different location." *Id.* at 5. Following that order, on August 27, 2018, Plaintiff filed a separate lawsuit in the Southern District of Illinois. [185] at ¶ 14(H). That court dismissed Plaintiff's complaint with prejudice for failure to state a claim on July 15, 2019. *Id.* Plaintiff filed his first amended complaint in this Court on November 13,

6

2019. [74]. This Court dismissed Plaintiff's first amended complaint without prejudice for misjoinder. [183].

The operative complaint—filed with the assistance of counsel on September 29, 2020, [185]—alleges that Defendants Pfister, Wexford, and Nicholson violated Plaintiff's Eighth Amendment rights by denying him adequate medical care, and that Defendant Pfister violated his Eighth Amendment rights by subjecting him to inhumane confinement conditions. Defendants, in two separate motions, [187], [188], moved to dismiss Plaintiff's claims.

## II. Legal Standard

To survive a 12(b)(6) motion, a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so that the Defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief, allowing this Court to "draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Thus, "threadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Iqbal*, 556 U.S. at 678.

In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in Plaintiff's favor.

*Id*. This Court does not accept a complaint's legal conclusions as true, however. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

### III. Analysis

#### A. Count I: Inadequate Medical Care

To allege a claim for inadequate medical care under the Eighth Amendment, Plaintiff must satisfy an objective and a subjective element. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish the objective element, Plaintiff's alleged medical need must be "sufficiently serious." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). A medical need qualifies as sufficiently serious when the condition "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). To meet the subjective element, Plaintiff must allege that each defendant deprived him of his sufficiently serious medical need with "deliberate indifference." *Roe*, 631 F.3d at 857.

##### 1. Wexford

Defendant Wexford moves to dismiss Plaintiff's claims against it on two grounds. First, Wexford asserts that the doctrine of *res judicata* bars Plaintiff's claims. [187] at 4–6. Second, Wexford moves to dismiss Plaintiff's claims for failure to state a claim. *Id.* at 6–8.

### a. *Res Judicata*

The final decision in *Perry v. Jaimet*, No. 18-CV-01581-SMY, 2019 WL 3074226 (S.D. Ill. July 15, 2019), does not bar Plaintiff's claims against Wexford here. Under federal law, *res judicata* applies when the following three elements exist: (1) a final decision in a previous case; (2) the new case arises from the same transaction or occurrence as the first case; and (3) the same litigants are parties to both cases. *Czarniecki v. City of Chicago*, 633 F.3d 545, 548 (7th Cir. 2011). *Res judicata* not only bars claims that one party brought in the first suit, but it also bars all claims the party could have brought in the first suit, regardless of whether the parties actually litigated them. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020).

Following this Court's partial dismissal of his initial complaint without prejudice, in which this Court informed Plaintiff that he could not bring claims in this Court based on events that took place at Pinckneyville, Plaintiff filed a separate complaint in the Southern District of Illinois. *See Jaimet*, 2019 WL 3074226, at *1 n.2. After granting Plaintiff two opportunities to amend his complaint, that court eventually dismissed Plaintiff's claims with prejudice. *Id.* at *1 n.2, 5. As that court noted in its summary of Plaintiff's second amended complaint, Plaintiff's claims dealt only with events that occurred at Pinckneyville. *Id.* at *1–2.

The decision to dismiss Plaintiff's claims with prejudice in the Southern District of Illinois is a final decision. Plaintiff named Wexford as a defendant in that suit as he does here. The dispute in this Court, though, does not arise from the same

9

transaction or occurrence; nor could Plaintiff have brought these claims in the Southern District of Illinois.

Courts hold that disputes arise from the same transaction or occurrence when they stem from a "common nucleus of operative facts." *Lucky Brand Dungarees*, 140 S. Ct. at 1594–95. *Lucky Brand Dungarees* involved litigation over a trademark dispute. *Id.* at 1592. During a 2005 lawsuit, Marcel alleged that Lucky Brand violated a previous settlement agreement by using Marcel's trademarked "Get Lucky" slogan. *Id.* During another lawsuit, this time in 2011, Marcel alleged that Lucky Brand's use of other marks since the 2005 lawsuit also infringed Marcel's "Get Lucky" trademark. *Id.* at 1593. The Court held that the two suits did not share a common nucleus of operative facts because they "were grounded on different conduct, involving different marks, occurring at different times." *Id.* at 1595. So, too, here.

Although the gulf is not as wide (and the events involved in this suit and the Southern District of Illinois suit remain similar), Plaintiff grounds the claims on different conduct that occurred in different places at different times. In both suits, Plaintiff alleges that Wexford provided him with inadequate medical care that violated the Eighth Amendment, and Plaintiff alleges he had the same or substantially similar medical needs both at Pinckneyville and the NRCC, including sleep apnea, hypertension, and issues related to his gastrectomy. But, as this Court ordered him to do, Plaintiff separated out the events surrounding the alleged inadequate medical care Wexford provided at Pinckneyville and the alleged inadequate medical care Wexford provided at the NRCC. Such care occurred at

10

different facilities at different times. Contrary to Wexford's assertion, the *Jaimet* court acknowledged as much. *Jaimet*, 2019 WL 3074226, at *1 ("Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising from the denial of adequate medical care *at Pinckneyville Correctional Center*") (emphasis added).

Nor could Plaintiff have brought the claims he presents here during his case in the Southern District of Illinois. Indeed, as this Court previously informed Plaintiff when it partially dismissed his initial complaint, "[a]ny medical care (or lack thereof) that Plaintiff may have received at Pinckneyville would have been provided by different Defendants in a different location." [36] at 5. Plaintiff responded to that order by filing his Pinckneyville-related claims in a more appropriate forum. For the same reasons this Court ordered Plaintiff not to allege Pinckneyville-related claims here, he could not have alleged the NRCC-related claims he brings here in the Southern District of Illinois.

Thus, *res judicata* does not bar Plaintiff's claims here.

### b. Failure to State a Claim

Turning to Wexford's argument that Plaintiff's claims fail to state a claim for which relief may be granted, the Court finds that Plaintiff has adequately pled a claim for inadequate medical care against Wexford. Plaintiff clears the objective hurdle: he pleads that he suffered from sleep apnea, hypertension, and arthritis and also required further treatment following gastrectomy surgery. These are conditions that, at a minimum, cause pain and, at worst, death if left untreated. Further, all

11

those conditions were "diagnosed by a physician as mandating treatment." *Greeno*, 414 F.3d at 653. Even if they were not, sleep apnea, hypertension, and treatment following gastrectomy surgery are serious enough "that even a lay person would perceive the need for a doctor's attention." *Id.*

Plaintiff also satisfies the subjective element. Courts must treat private corporations like Wexford that contract with the government as municipalities for liability purposes under § 1983. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Thus, to meet the subjective element, Plaintiff must prove the existence of a Wexford policy that infringed upon his constitutional rights and that also was the direct cause of the alleged inadequate medical care. *Id.* Plaintiff need not prove that a formal policy existed; he may instead prove a policy indirectly by showing that Wexford displayed deliberate indifference to his alleged harm. *Id.* To make that showing, Plaintiff must allege a series of bad acts, which create an inference that Wexford was aware of and condoned the misconduct of its employees. *Id.*

Wexford argues that plaintiff cannot show a series of bad acts, and thus an unconstitutional policy, by relying solely on the circumstances surrounding his own treatment. Not so. Seventh Circuit precedent contradicts such a blanket assertion about how Plaintiff may show a series of bad acts. *See Phelan v. Cook County*, 463 F.3d 773, 789–90 (7th Cir. 2006) ("Generally speaking, we do not believe that a plaintiff should be foreclosed from pursuing Section 1983 claims where she can demonstrate that repeated actions directed at her truly evince the existence of a policy."), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760

12

(7th Cir. 2016)). In *Phelan*, the court held that necessarily closing the door to a plaintiff's claim based upon "repeated acts" directed just at plaintiff potentially placed an unreasonable burden on that plaintiff. *Id*. at 789. Although a plaintiff seeking to make such a claim faces an uphill battle, *id*. at 790 ("the word 'widespread' must be taken seriously"), no categorical bar exists for such a claim.

Moreover, this case is still at the initial stage, and the cases Wexford relies upon to support its argument were decided at the summary judgment stage. This is significant for two reasons. First, at this point in the proceedings, this Court cannot say whether Plaintiff might later overcome the potential deficiencies of proof Wexford flags. *See Palmer v. Marion County*, 327 F.3d 588, 596–97 (7th Cir. 2003) (explaining that to overcome deficiencies, "during discovery, [Plaintiff] might have queried Jail officials" or "[s]imilarly, Plaintiff could have obtained raw data from the defendants' records"). The *Palmer* court granted summary judgment in part because the plaintiff put forward only two instances of possible misconduct by the defendant. *Id*. at 595–96. Here, in contrast, Plaintiff has pled enough specific facts to infer a widespread practice and unconstitutional policy of deliberate indifference: he alleges that officials transferred him at least seven times, each time denying him his medication upon transfer. [185] at ¶ 23. On "numerous occasions" after a transfer, Plaintiff filed an emergency grievance requesting medication, and, each time, officials downgraded his grievance and then denied it or referred it to the medical unit, prolonging Plaintiff's wait for necessary medication. *Id*. at ¶ 25. A reasonable fact finder could infer, based solely upon Plaintiff's experiences, that Wexford had a policy of not transferring

13

medications with prisoners and making prisoners wait for necessary medications after any such transfer. Accordingly, this Court denies Wexford's motion to dismiss.

### 2. Pfister and Nicholson

Defendants Pfister and Nicholson move to dismiss Plaintiff's inadequate medical care claim against them under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the following reasons, this Court grants the motion as to Nicholson, but grants in part, and denies in part, as to Pfister.

Plaintiff alleges that Defendant Nicholson served as Stateville's warden during the time officials incarcerated Plaintiff in the IDOC system. [185] at ¶ 10. Plaintiff's only specific allegations against Nicholson throughout his Second Amended Complaint, however, assert that Nicholson received two grievances (one related to Plaintiff's gastrectomy treatment and one related to his hypertension), downgraded them to nonemergency status, and referred both complaints to the medical unit for follow-up. *Id.* at ¶¶ 45, 52. Because Plaintiff "alleges no personal involvement by the warden outside of the grievance process," this Court must dismiss his inadequate medical care claim against Nicholson because it fails to state a proper claim. *Gevas v. Mitchell*, 492 Fed. App'x 654, 660 (7th Cir. 2012).

Turning to Defendant Pfister, Plaintiff alleges that Pfister served as Stateville's Assistant Warden of Programs. [185] at ¶ 8. An "inmate's correspondence to a prison administrator may . . . establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015). But the only

14

specific allegation Plaintiff provides that could suffice to qualify as such correspondence is an emergency grievance Plaintiff filed around January 8, 2018, in which he complained about a lack of access to a CPAP machine to help treat his sleep apnea. [185] at ¶ 29. Plaintiff alleges that Pfister received this grievance and downgraded it to nonemergency status around January 11, 2018. *Id.* at ¶ 30. According to his complaint, no one told Plaintiff his family must provide him with the CPAP machine until February 16, 2018, and, despite repeated attempts to deliver a machine, his family could not get him the CPAP machine until July 2, 2018. ¶¶ 33, 37. The allegation that Pfister received this CPAP-related grievance and responded to it only by downgrading it to nonemergency status, combined with the other allegations (i.e., that no one told him his family could provide him with a CPAP machine and that, despite repeated attempts, no one allowed Plaintiff's family to provide that CPAP machine for approximately four months), suffice at this stage. These allegations show that Pfister was aware Plaintiff required a CPAP machine to treat his objectively serious sleep apnea condition but failed to provide Plaintiff with any access to a CPAP machine. *Perez*, 792 F.3d at 782 (explaining that a defendant's alleged refusal or declination to exercise the authority of his office can serve as evidence of deliberate disregard).

 Aside from the sleep apnea and CPAP issues, however, Plaintiff does not specifically allege that Pfister was aware of any of Plaintiff's other medical conditions. Plaintiff does not allege that Pfister received or responded to any specific grievances regarding his hypertension, treatment for gastrectomy surgery (including acid reflux,

15

Vitamin D deficiency, and special diet), or arthritis and back pain. Because Plaintiff does not allege that Pfister was aware of these other medical conditions and the treatments Plaintiff required for them, this Court grants the motion to dismiss on those specific aspects of Plaintiff's inadequate medical care claim against Pfister.

In sum, this Court dismisses Plaintiff's inadequate medical care claim against Nicholson and dismisses the claim against Pfister as to Plaintiff's hypertension, treatment for gastrectomy surgery, arthritis, and back pain. But Plaintiff may proceed on his inadequate medical care claim against Pfister as to Plaintiff's sleep apnea.

### B. Count II: Inhumane Confinement Conditions

In addition to his inadequate medical care claim, Plaintiff also asserts a claim regarding the conditions of confinement against Defendant Pfister. As with his medical care claim, to allege a claim for inhumane confinement conditions under the Eighth Amendment, Plaintiff must satisfy an objective and a subjective element. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Plaintiff must allege facts showing: (1) his living conditions were so poor they deprived him "of the minimal civilized measure of life's necessities" (the objective prong); and (2) Pfister acted with deliberate indifference to those conditions (the subjective prong). *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 832, 834 (1994)).

Allegations of freezing cell temperatures and pest infestations can meet the objective prong of an inhumane confinement conditions claim. *Taylor v. Riojas*, 141

16

S. Ct. 52, 53 (2020) (freezing temperatures); *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (pests). To be sure, "alleging the mere presence of a laundry list of pests, without more, is not sufficient to state a constitutional claim." *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015). But Plaintiff provides more than a laundry list. Plaintiff alleges that rodents infested *his* cell, and that he observed mice in *his* food. [185] at ¶ 61; *see Dart*, 803 F.3d at 312 (declining to find that plaintiff stated a sufficient claim in part because he failed to allege that pests were present in his cell or that he ever came in contact with the pests).

Pfister argues that, even if such conditions existed, Plaintiff endured them for too short a time to give rise to a constitutional violation. Not so. In *Taylor*, the Supreme Court held that the plaintiff's alleged confinement conditions, which lasted just six days across two cells, supported a proper claim for unconstitutional conditions of confinement. 141 S. Ct. at 53. Although the conditions alleged in *Taylor* were far worse than those alleged here, Plaintiff's allegations nonetheless suffice: Plaintiff alleges he spent approximately twenty-six days in a cell with below freezing temperatures with inadequate clothing and bed covers and ten days in a cell riddled with mice. [185] at ¶ 59–61.

Likewise, Plaintiff satisfies the subjective prong. At the pleading stage, a court can infer personal involvement and knowledge by senior administrators like Pfister where "the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations." *Dart*, 803 F.3d at 309 n.2 (quoting *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996)). Alleged pest infestations qualify as

17

potentially systemic. *See Gray v. Hardy*, 826 F.3d 1000, 1008–09 (7th Cir. 2016). Similarly, allegations about living in freezing temperatures for roughly twenty-six days are potentially systemic because "the risk of both physical and psychological harm is obvious." *Id.* at 1009.

Moreover, Plaintiff alleges that Pfister did nothing to improve Plaintiff's confinement conditions. Pfister allegedly downgraded Plaintiff's grievance about freezing conditions to nonemergency status. [185] at ¶ 60. And he failed to move Plaintiff or to arrange for additional clothing or covers. *Id.* These allegations raise an inference that Pfister acted with deliberate indifference to the freezing temperatures and rodent infestation. Thus, the Court denies Pfister's motion to dismiss Plaintiff's unconstitutional confinement conditions claim.

## IV. Conclusion

For the reasons explained above, this Court denies Wexford's motion to dismiss [187] and grants in part and denies in part Pfister and Nicholson's motion to dismiss [188]. Plaintiff may proceed on his inadequate medical care claim against Wexford (as to all medical issues) and against Pfister (as to sleep apnea only); Plaintiff may also proceed on his confinement conditions claim against Pfister.

Dated: September 24, 2021

Entered:

John Robert Blakey
United States District Judge